UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------
                                                                 :

DANIEL KOSLOSKI,                      :

                                                                 :         CASE NO.: 1:07-cv-00947

                        Plaintiff,            :

                                                 :

vs.                                                  :         OPINION & ORDER

                                               :         [Resolving Doc. Nos. 40, 65, 66, 67, 68.]

DAN DUNLAP, *et. al.*,               :

                                             :

                      Defendants.     :

                                             :
--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

With this Opinion and Order, the Court addresses the Defendants' motion for summary judgment. [Doc. 40, 67.[1/]] The Plaintiff opposed the Defendants' motion on February 14, 2008. [Doc. 65, 66.[2/]] The Defendants filed a reply brief on February 21, 2008. [Doc. 68.]

For the reasons described below, the Court **GRANTS** the Defendants' motion for summary judgment, thereby dismissing the Plaintiff's federal claim with prejudice and his state law claims without prejudice.

**I. Background**

Plaintiff Daniel Kosloski ("Kosloski") alleges that the Defendants violated his constitutional

---

[1/] The Defendants initially submitted their brief on January 28, 2008. [Doc. 40.] Per the Court's request, the Defendants refiled the same brief on February 21, 2008 in a different format. [Doc. 67.] For the purposes of hyperlinking to the Defendants' brief here, the Court will hyperlink to the initial brief, Doc. 40.

[2/] Doc. 66 is the same document as Doc. 65 and was submitted per the Court's request to re-file briefs in the proper format. For the purposes of hyper-linking to the Plaintiff's brief here, the Court will hyperlink to Kosloski's initial brief, Doc. 65.

Case No. 1:07-cv-00947
Gwin, J.

rights under 42 U.S.C. § 1983 and violated his state law rights through their deliberate indifference to and otherwise failure to meet his medical needs while he was incarcerated at the Lake County jail ("the Jail") in 2005.  [Doc. 13, 65.]

Plaintiff Kosloski has a history of drug use and addiction.  [Doc. 65-2 at 2.]  The Plaintiff's girlfriend, Kristen Garcia ("Garcia"), has a similar history.  *Id.*  They began using heroin together in the early 1990's.  *Id.*  Plaintiff Kosloski and Garcia shared needles when injecting heroin.  *Id.*

Endocarditis is an infectious blood disease that causes vegetations to grow on the heart's valves.  [Doc. 40 at 81.]  The vegetations may break off from the heart valves and travel through the blood stream to the brain, increasing the risk of stroke.  *Id.*  Endocarditis symptoms include fatigue, chills, chest pain, shortness of breath and bleeding under the fingernails.  *Id.* at 82.  Fever and nausea can also accompany endocarditis; however, these symptoms may accompany most types of bacterial infections.  *Id.*  Sharing needles with others infected increases the risk of acquiring endocarditis.  [Doc. 65-4 at 2.]

In 2004, Garcia told Kosloski that she had endocarditis.  [Doc. 65-2 at 2.]  Throughout 2004, Garcia and Kosloski continued to share needles.  *Id.*  In March 2005, Garcia was treated for endocarditis at the Hillcrest Hospital.  *Id.*  Kosloski stayed with her during some of her time at Hillcrest.  *Id.* at 3.  When he was present in her room one day, one of Garcia's Hillcrest doctors suggested that Kosloski get tested for endocarditis because he could also be infected from their needle sharing.  *Id.*

In mid-March 2005, one to two weeks before he was incarcerated at the Lake County Jail, the Plaintiff went to the Hillcrest Hospital emergency room because of blood in his stool.  [Doc. 40 at 27.]  When at the Hillcrest emergency room, Kosloski does not remember mentioning nor did the Hillcrest emergency room doctors diagnose Kosloski with endocarditis.  [*Id.* at 31, 82.]  Blood in

Case No. 1:07-cv-00947
Gwin, J.

one's stool is not a symptom of endocarditis. [Doc. 68-3 at 4.]

On March 31, 2005, Plaintiff Kosloski was arrested for violating the terms of his probation and sentenced to a term of sixty days at the Lake County Jail. [Doc. 40 at 76.]

Upon arrival at the Jail, the Defendants say that inmates report any medical conditions they have and undergo a physical examination unless they have received such an exam during a prior incarceration within the previous year. *Id.* at 92. The Defendants present the medical screening form that Kosloski signed. With that screening form, Kosloski reported his medical conditions at the time of his 2005 arrival to the Jail; there is no mention of endocarditis.[3/] [Doc. 68-4.] However, Kosloski believes that he shared his concern that he had endocarditis at the time he went into the Jail. [Doc. 65-2 at 3.] The Defendants explain that they did not physically examine Kosloski because he received a physical exam in September 2004 (within the past year) when he was previously incarcerated at the Jail.[4/] [Doc. 40 at 92.]

On April 1, 2005, Plaintiff Kosloski sent a "kite"[5/] to Defendant Nurse Anne Takacs ("Nurse Takacs"), a registered nurse, informing her that he had blood in his stool and that he had "antartice." *Id.* at 93. In response, Nurse Takacs met with Kosloski that same day. *Id.* After the Nurse clarified that Kosloski thought he had endocarditis (after the misspelling in the kite), Kosloski explained that the reason he thought he had the disease was because he and his girlfriend, who had the infection, shared needles while injecting heroin together. *Id.* At the meeting, Kosloski had no symptoms of

---

[3/] Under the "Additional Comments" section, the report indicates "possible heroin withdraw per Officer Lessick." [Doc. 68-4 at 2.]

[4/] Plaintiff Kosloski was previously incarcerated at the Jail from September through December 2004. [Doc. 40 at 92.]

[5/] When inmates seek medical attention, they fill out a request form, also called a "kite." The Jail's nurses review the kites to determine the appropriate response. If the nurse decides that the inmate should see the doctor, the nurse sets up an appointment for the inmate with the Jail's doctor, Defendant Dr. Carla Baster. [Doc. 40 at 97.]

Case No. 1:07-cv-00947
Gwin, J.

endocarditis and indicated that he had not been diagnosed or treated for endocarditis. [Doc. 40 at 93.] Nurse Takacs says that with this information and after finding his vital signs and his skin to be normal, she returned him to the range. *Id.* at 94. Nurse Takacs admits that she did not listen to his heart, take his temperature, refer him for tests, take a physical exam, further monitor him, or communicate with the Jail doctor, Defendant Dr. Carla Baster ("Dr. Baster"), or anyone else about the visit. [Doc. 65-7 at 1-2.] According to Kosloski, the meeting between the Plaintiff and Nurse Takacs lasted two minutes and concluded by Nurse Takacs telling him to "quit wasting my time." [Doc. 40 at 36.]

Plaintiff Kosloski sent three other kites during his stay at the Jail. On April 11, 2005, he requested a dentist appointment because of a broken tooth, and Defendant Nurse Carolyn Barbish ("Nurse Barbish"), a certified licensed practical nurse, placed him on the list to see the dentist. [Doc. 40 at 97.] On April 21, 2005, the Plaintiff sought to switch his toothache medication from tylenol to motrin, and Nurse Barbish responded by repeating that he was on the dentist list as well as the list to receive motrin. *Id.* at 98.

On May 24, 2005, Plaintiff Kosloski sent his final kite. With this kite, he complained of a fever, vomiting and an inability to eat. *Id.* at 98. He did not mention endocarditis. *Id.* Nurse Barbish thought he likely had the flu. [Doc. 61 at 25, 27.] Nurse Barbish says she responded to the appropriate officers "that Mr. Kosloski could receive pepto-bismal for his nausea, and would see Dr. Baster if his problems continued." *Id.* at 98. The Plaintiff says, "I received no response from anyone regarding the May 24, 2005 kite; no one told me that Nurse Barbish had instructed the corrections officers at the minimum security facility to observe me; or, that there was a possibility that I would receive medical treatment if I told the corrections officers there that the fevers and vomiting continued." [Doc. 65-2 at 5-6.]

-4-

Case No. 1:07-cv-00947
Gwin, J.

Plaintiff Kosloski did not send any more kites to the Defendants. [Doc. 40 at 46.]

On June 2, 2005, the Plaintiff was released from the Jail to the Salvation Army Halfway House. *Id.* at 50. After a few days at the Halfway House, the Plaintiff suffered a stroke and lost his peripheral vision. *Id.* at 52, 60. A few days later, he met with a Salvation Army doctor who, upon learning what had happened, sent him to the Akron City Hospital emergency room. *Id.* at 61-62. The doctors there performed some tests and then told Kosloski that he had endocarditis that caused the stroke and accompanying vision loss a few days earlier. [Doc. 65-2 at 6.] They explained that he needed heart valve replacement surgery and scheduled the surgery for September 2005. *Id.*; [Doc. 59 at 13.] Plaintiff Kosloski suffered another stroke in July 2005 and then had the surgery in September 2005. [Doc. 65-2 at 6.]

The Defendants allege that Kosloski returned to intravenous drug use in the summer of 2005 and acquired a second and separate strand of endocarditis "unrelated to his first case of said illness." [Doc. 40 at 82.] They say that this second strand of endocarditis caused his more severe stroke in July 2005 and the need for the heart valve replacement surgery in September 2005. *Id.*

Plaintiff Kosloski says he suffered another stroke following the surgery. [Doc. 65-2 at 7.]

Plaintiff Kosloski filed his complaint on March 30, 2007 and his amended complaint on September 10, 2007. [Doc. 13.] With his complaint, he alleges that the Defendants' failure to meet his medical needs violated the Eighth Amendment to the U.S. Constitution, Ohio Administrative Code 5120:1-8-09, and state law prohibiting wanton and reckless conduct. *Id.*

The Defendants moved for summary judgment on January 28, 2008. [Doc. 40.] The Plaintiff opposed the Defendants' motion on February 14, 2008. [Doc. 65.] The Defendants filed a reply brief on February 21, 2008. [Doc. 68.]

Case No. 1:07-cv-00947
Gwin, J.

## II.  Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  "A fact is material if its resolution will affect the outcome of the lawsuit." *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323 (quoting FED. R. CIV. P. 56(c)).  However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *Id.* at 586.  Nor can the nonmoving party rely upon the mere allegations or denials of its pleadings. FED. R. CIV. P. 56(e).

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *Nat'l Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir. 1997).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence that

-6-

Case No. 1:07-cv-00947
Gwin, J.

makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968)). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).

### III. Discussion

The Court will first address the Plaintiff's federal, Section 1983, claim and ultimately dismiss it. The Court will then decline to exercise supplemental jurisdiction over the Plaintiff's remaining state law claims.

*A. Section 1983 Claim Against Individual Defendants*

Title 42 U.S.C. 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. The Plaintiff's 1983 claim is that the Defendants have subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. *Bowman v. Corrections Corp. of America,* 350 F.3d 537, 543 (6th Cir. 2003). The Eighth Amendment prohibits cruel and unusual punishment, i.e., punishment that runs afoul of evolving societal standards of decency or involves the unnecessary and wanton

Case No. 1:07-cv-00947
Gwin, J.

infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). "Punishment" for Eighth Amendment purposes need not come in the form of a criminal penalty. Conditions of incarceration may also constitute punishment actionable under the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("The Constitution does not mandate comfortable prisons, . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." (internal quotations omitted)).

When prison officials are deliberately indifferent to prisoners' serious medical needs, they violate the Eighth Amendment. *Estelle*, 429 U.S. at 104. Such an Eighth Amendment claim includes both objective and subjective components. The objective component requires a prisoner to show that the medical need at issue is "sufficiently serious." *Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 834). "[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. To satisfy the subjective component, a prisoner must establish that the prison official responsible for these conditions acted with "deliberate indifference." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). An official acts with deliberate indifference when the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Prisoners state an Eighth Amendment claim when prison authorities have denied reasonable requests for medical treatment, when there was an obvious need for such attention, and which exposed the prisoner to undue suffering or the threat of tangible residual injury. *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976); *see also Byrd v. Wilson*, 701 F.2d 592, 594 (6th Cir. 1983).

-8-

Case No. 1:07-cv-00947
Gwin, J.

However, medical malpractice does, of itself, not constitute an Eighth Amendment violation: "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

After construing the factual evidence in the light most favorable to Plaintiff Kosloski, the Court will find that no reasonable juror could find that the Defendants violated the Eighth Amendment in their medical care of Plaintiff Kosloski. While the Plaintiff meets the objective prong of the Eighth Amendment analysis, he fails to satisfy the subjective prong. For this reason, his Eighth Amendment claim fails.

*1. Objective Prong*

The Plaintiff provides sufficient evidence to permit a rational juror to find that "the medical need at issue is sufficiently serious." *See Comstock*, 273 F.3d at 702-03. One way that plaintiffs may make this showing is by demonstrating that the delay in treatment caused injury or loss. *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). Inmates "who complain[] that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Id*. (quotation omitted).

The Court finds that the Plaintiff provides such evidence. First, the parties do not dispute the serious consequences of endocarditis; both parties agree that endocarditis caused the Plaintiff's

-9-

Case No. 1:07-cv-00947
Gwin, J.

strokes (and related vision loss) and heart valve damage.[6/] Dr. Jeffrey S. Garrett, M.D., one of the Plaintiff's medical experts, states in his affidavit: "It is a serious disease that left untreated can result in death." [Doc. 65-4 at 2.] Second, Dr. Garrett shares that those who engage in intravenous drug use and share needles with those infected with endocarditis are at increased risk for this dangerous disease. [Doc. 65-4 at 2-3.] Third, the Plaintiff provides evidence showing the importance of early treatment in minimizing the risks of endocarditis. Dr. Garrett says, "Fortunately infective endocarditis can be treated very successfully with antibiotics. When treated early 90% to 95% of patients are cured with no need for heart valve replacement and no appreciable stroke activity." [Doc. 65-4 at 3.] Finally and most importantly under *Napier*, the Plaintiff provides "verifying medical evidence . . . to establish the detrimental effect of the delay in medical treatment" in this case from Dr. Garrett:

> Given that infective endocarditis responds so well to antibiotics; if Mr. Kosloski had been diagnosed with infective endocarditis and received treatment and care on April 1, 2005 when he reported he had been a heroin addict for several years; that he had been recently sharing needles with another heroin addict who was currently being treated for infective endocarditis at a hospital; that while he was at the hospital one of the doctors there told him he should be examined for infective endocarditis because by sharing needles he may have contracted the disease himself, in my opinion, to a reasonable degree of medical probability, Mr. Kosloski would not have had required a heart valve replacement or suffered the occipital lobe infarct (stroke).

[Doc. 65-4 at 3-4.] *See also* [Doc. 65-3 at 7.]; [Doc. 65-5 at 2.].

The Defendants say that the strand of endocarditis Kosloksi had at the Jail did not cause his later, more severe medical conditions. They claim that Kosloski's return to drug use following his May 2005 release from jail caused a second and more harmful strand of endocarditis that caused the

---

[6/] When the Defendants argue that a separate and distinct strand of endocarditis caused the later July 2005 stroke and heart valve damage that resulted in surgery in September 2005 [Doc. 40 at 82-83.], they concede that these are the sorts of serious effects of endocarditis.

-10-

Case No. 1:07-cv-00947
Gwin, J.

more damaging stroke in July 2005 and the need for heart valve replacement surgery in September 2005. [Doc. 40 at 82-83.] Therefore, the Defendants' medical expert, Dr. Keith B. Armitage, M.D., states, "Mr. Kosloski's current medical condition would not be significantly different had he received earlier therapy and or treatment" at the Jail. [Doc. 40 at 83.] The Plaintiff and Dr. Garrett respond that Kosloski set up his heart surgery appointment in June 2005 upon the recommendation of the doctors he saw then, showing that the damage was evident in June 2005, immediately upon leaving the Jail.[7/] [Doc. 65-2 at 6; Doc. 65-4 at 6.]

Construing these facts in the light most favorable to the Plaintiff, the Court finds that a rational juror could conclude that a delay or lack of treatment of endocarditis is sufficiently serious, life-threatening in fact, to satisfy the objective prong of the Eighth Amendment analysis.

*2. Subjective Prong*

However, the Court next finds that the Plaintiff fails to provide sufficient evidence for a rational juror to conclude that he satisfies the subjective prong. Under the subjective test, the Plaintiff must first provide sufficient evidence to show the prison official's "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). The prisoner "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. Courts must distinguish between evidence supporting an Eighth

---

[7/] Dr. Garrett further says, "Nothing Mr. Kosloski did between the time he left the Salvation Army in June and September when he received the new heart valve would have affected the need for the replacement of his heart valve." [Doc. 65-4 at 6.] While he agrees that Kosloski had a new infection in July 2005, he says, "It is also true that the new infection was irrelevant so far as the need to replace his heart valve is concerned." [Doc. 65-4 at 7.]

-11-

Case No. 1:07-cv-00947
Gwin, J.

Amendment violation versus that supporting a medical malpractice claim: "[a]llegations of inadvertent failure to provide adequate medical care or of a negligent diagnosis simply fail to state a cause of action" under the Eighth Amendment although they might state a medical malpractice claim. *Selby v. Martin*, 84 Fed. Appx. 496, 499 (6th Cir. 2003).

Second, after making the knowledge showing, the Plaintiff must show that the Defendants failed to reasonably respond to the risk of which they knew. *Farmer*, 511 U.S. at 844.

The Court first reviews the Plaintiff's strongest evidence suggesting that Nurse Takacs had knowledge of the substantial risk Kosloski faced. First, in his affidavit, Plaintiff Kosloski describes the communication between he and Nurse Takacs on April 1, 2005. He told her:

> a. I was a heroin addict.
> b. I was a heroin addict for several years.
> c. I had been sharing needles with another heroin addict, Ms. Garcia for several years.
> d. I told Nurse Takacs that Ms. Garcia was in Hillcrest Hospital being treated for infective endocarditis and I was staying with her there when I was arrested the previous day.
> e. I told Nurse Takacs that while I was at the hospital one of the doctors who was treating Ms. Garcia also told me that, if I had been sharing needles with Ms. Garcia, it was quite possible that I had infective endocarditis and I should be examined to determine if I had been infected.

[Doc. 65-2 at 3-4.] *See also* [Doc. 40 at 35-37]. As described above, Dr. Garrett says that this needle sharing with Garcia indicates he was at increased risk for the infection. [Doc. 65-4 at 2-3.] Second, Nurse Takacs acknowledges some familiarity with endocarditis, its serious nature, and its possible transfer through intravenous drug use; however, the Plaintiff does not provide additional detail on the extent of her knowledge. [Doc. 40 at 93; Doc. 65-7 at 2.; Doc. 63 at 20.] Third, the Plaintiff's medical expert, Dr. Garrett, says that a nurse who was told by a patient that:

> he, the patient, had been a heroin addict for several years; that he had been recently sharing needles with another heroin addict who was currently being treated for infective endocarditis at a hospital; and, that while he was at the hospital one of the

-12-

Case No. 1:07-cv-00947
Gwin, J.

> doctors said to him that it was possible that he, the patient, had infective endocarditis because by sharing needles he may have contracted the disease himself; *would know that the patient was at risk for having infective endocarditis;* would refer that patient to a physician for further evaluation; Nurses are not trained to diagnose infective endocarditis.

[Doc. 65-4 at 3.] (emphasis added).

The Court finds that this evidence, if believed, likely shows that a reasonable nurse, with the information Kosloski provided, would have or should have known the Plaintiff was at substantial risk of serious harm and should have referred him to the jail physician. However, the Supreme Court has specifically rejected an objective interpretation of "deliberate indifference":

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*. . . . An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38 (internal citations omitted) (emphasis added). See also *Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir. 1994) ("The official may be incompetent, but he is not acting wantonly, and thus is not inflicting 'punishment.'") Not only does the Court find the above evidence insufficient to meet the subjective test, but the Plaintiff nearly concedes that Nurse Takacs did not subjectively recognize the risk: "From casual observation she concluded that Plaintiff . . . was at no risk of endocarditis." [Doc. 65 at 21.]

Thus, without more, the Plaintiff has not provided sufficient evidence to permit a rational juror to infer Nurse Takacs's subjective knowledge of the substantial risk of serious harm Kosloski

-13-

Case No. 1:07-cv-00947
Gwin, J.

faced. Rather, the evidence shows that Nurse Takacs decided not to refer Kosloski for further examination because she, wrongly, thought he did not have endocarditis. She thought this because of his lack of diagnosis, treatment and most importantly, symptoms suggesting endocarditis. [Doc. 40 at 93.] The Plaintiff does not dispute the truth of these considerations; most notably, he does not dispute that he had no symptoms suggesting endocarditis when he visited the Nurse on April 1, 2005. Finally, with no dispute as to the fact that he had no symptoms on April 1, 2005, the Court finds that the Plaintiff also does not put forward enough evidence to support an Eighth Amendment violation on a grossly inadequate medical care theory. *See Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir.2002) (Eighth Amendment violations also "may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment.") (internal quotation omitted).

The Court finds even less evidence to suggest that Nurse Barbish had knowledge of the substantial risk Kosloski faced. The Plaintiff's strongest evidence indicating Nurse Barbish's knowledge is that she knew of Kosloski's fever, vomiting and inability to eat through his May 24, 2005 kite; these symptoms can accompany infections like endocarditis; she might have placed her responses to Kosloski's kites into his file that included Nurse Takacs's April 1, 2005 notation mentioning his concern of endocarditis; and therefore, she possibly saw mention of endocarditis even though she claims no knowledge of Kosloski's endocarditis concern. [Doc. 65-8; Doc. 40 at 98.] The Plaintiff says that the Nurse's knowledge of these symptoms along with her alleged review of Nurse Takacs's notes from the April 1, 2005 meeting provide enough evidence for a rational juror to find that Nurse Barbish had the requisite knowledge.

However, the Plaintiff only provides evidence that Nurse Barbish knew of his May 24, 2005 kite indicating his fever, vomiting, and inability to eat. Nurse Barbish said these symptoms

-14-

Case No. 1:07-cv-00947
Gwin, J.

indicated the flu to her. [Doc. 61 at 25, 27.] The Plaintiff's own medical experts suggest the weak value of this evidence. Dr. Garrett admits that "lots of things can cause fever and nausea" while Dr. Spagna says vomiting is not a classic symptom of endocarditis. [Doc. 68-3 at 5; Doc. 68-5 at 2.] As to Nurse Barbish's knowledge of Nurse Takacs's notation mentioning endocarditis, the Court finds no evidence to dispute her assertion that she does not recall ever seeing this notation. The Court also notes that Nurse Barbish stated that had she known of what Nurse Takacs knew, she would have taken the Plaintiff's vitals and referred him to the Jail physician. [Doc. 65-8 at 12.] Again, while Nurse Barbish likely acted negligently in failing to review Kosloski's file upon acting on his kite, the Plaintiff fails to show she knowingly disregarded the risk he faced.[8]

Having found no Eighth Amendment violation committed by Nurse Takacs and Nurse Barbish, the Court cannot find that their supervisors, Defendant Dr. Carla A. Baster ("Dr. Baster") or Defendant Dan Dunlap ("Sheriff Dunlap"),[9] committed Eighth Amendment violations in their supervisory capacity of the Nurses. *See Comstock*, 273 F.3d at 713 (where the prison employee did not commit a constitutional violation, the employee's supervisor could not have "'implicitly authorized' or 'knowingly acquiesced' in any unconstitutional conduct").

---

[8] Because the Plaintiff fails to meet the first part of the subjective test, the knowledge test, as to both Nurses, the Court need not address whether the Defendants responded reasonably to the risk Kosloski faced, the second part of the subjective test.

[9] To the extent the Plaintiff sues these Defendants in their individual capacities, the Plaintiff offers no evidence suggesting either Defendants' subjective knowledge. Therefore, there is no evidence to suggest that they acted with deliberate indifference in their own acts or omissions involving Kosloski. In fact, the Plaintiff concedes that Dr. Baster had no knowledge of Kosloski's concern regarding endocarditis: "Dr. Baster knew nothing of Plaintiff's symptoms, the progress notes Nurse Takacs placed in Plaintiff's medical file on April 1, 2005, Plaintiff's fevers and vomiting or Nurse Barbish's instructions." [Doc. 65 at 10.]

Case No. 1:07-cv-00947
Gwin, J.

*B. Section 1983 Claim Against County Defendant*[10/]

The liability of local governments under 42 U.S.C. § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a "policy" or "custom" attributable to the local government. *See Halloway v. Brush,* 220 F.3d 767, 772 (6th Cir. 2000). The Supreme Court has held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).

The "deliberate indifference" standard also applies to county defendants:

> The County has "a duty ... to recognize, or at least not to ignore, obvious risks . . . that are foreseeable," and to take reasonable steps to prevent [such a risk] "[w]here such a risk is clear." *Gray*, 399 F.3d at 618. . . . '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. at 410, 117 S.Ct. 1382.

*Perez,* 466 F.3d at 430.

To establish municipal liability under section 1983 for a failure to train local government employees, it must be shown that: "the training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or actually caused the plaintiff's injury." *Kanavos v. Hardeman,* 162 F.3d 1161, at *7 (6th Cir. 1998) (quoting *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir. 1994)).

---

[10/] To the extent the Plaintiff sues any of the Defendants in their official capacities, he is suing the County. *See Taylor v. Franklin County,* 104 Fed.Appx. 531, 542 (6th Cir. 2004) ("A suit against an individual 'in his official capacity' has been held to be a suit directly against the local government unit.").

Case No. 1:07-cv-00947
Gwin, J.

As to the County's written policies, the Plaintiff concedes no violation: "In fact, had the medical personnel . . . followed their own written policies and procedures Mr. Kosloski's endocarditis would have been appropriately diagnosed and treated before June 2, 2005." [Doc. 65 at 24.] As to the Plaintiff's suggestion that the Jail's unwritten policies or customs violate the Eighth Amendment, the Court finds insufficient evidence for a juror to find an Eighth Amendment violation here. First, the Court has already found that the Nurse's actions in this case, while possibly negligent, were not unconstitutional; thus, the Plaintiff's suggestion that the Jail's customs, as evidenced by the Nurse's conduct, were unconstitutional fails under these facts. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.")

Setting aside the allegations involving the Nurses, the Plaintiff alleges three other Jail policies or customs that deprived Kosloski of his Eighth Amendment rights: 1) the failure of health trained personnel[11] to adequately screen him upon arrival; 2) the failure of qualified health care personnel to more fully examine him within fourteen days of arrival, including administering a physical examination and conducting necessary laboratory work and observation; and 3) the failure of Dr. Baster to come to the facility four times per week.[12]  [Doc. 65 at 23-24.]  As to all of the

---

[11] The Ohio Administrative Code defines "health trained personnel" as "Members of the jail staff that are trained in limited aspects of health care, including correctional officers and other personnel approved by the jail physician." OAC 5120:1-7-02(B)(19).

[12] As described above, the Court first notes that the Jail's written policies mostly comply with the Plaintiff's requests on these three fronts.
Lake County Sheriff's Office Policy and Procedure ("Sheriff Policy") 203 provides, "A preliminary health receiving screening shall be completed by health trained personnel on all prisoners upon reception, and prior to being placed in general population."  [Doc. 54-6 at 5.]  Here, the Plaintiff says he was not screened by "health trained personnel."
Sheriff Policy 248 provides that it is the Jail's policy to "have our medical personnel give to all inmates that are here at least ten (10) days a physical examination within fourteen days of their confinement."  [Doc. 54-6 at 29.]
(continued...)

Case: 1:07-cv-00947-JG Doc #: 71 Filed: 03/03/08 18 of 19. PageID #: 982

Case No. 1:07-cv-00947
Gwin, J.

above allegations, the Plaintiff provides no evidence to meet the subjective prong of the Eighth Amendment, that the County or its policy-makers had any knowledge that these failures create a substantial risk of serious harm to inmates like Kosloski. The Plaintiff also offers no evidence of incidents occurring with other inmates at the Jail to support his pattern of violations argument. [Doc. 65 at 18, 27.] Further, the Plaintiff provides no evidence to support a failure to train claim. [Doc. 65 at 18.] The Plaintiff offers no information regarding the type of training anyone involved with the medical policies, procedures and practices at the Jail receives, including the training of the intake officer who filled out Kosloski's health screening form.[13/] While the County's policies might violate state law, without more evidence, the Court cannot find that they violate the Eighth Amendment.

*C. State Law Claims*

Having already dismissed the sole federal claim against the Defendants, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. [Doc. 13.] District courts may decline to exercise supplemental jurisdiction if "the court has dismissed all claims over which

---

[12/](...continued)
However, this policy also implies the exception to this rule that the Defendants describe–that one does not receive a physical exam if he has received such an exam in the past year during a prior incarceration: "Records are then reviewed to determine if an H & P has been done on the inmate in the last 12 months." [Doc. 54-6 at 30.] The written policy does not clarify what occurs if the inmate has received such a physical in the past year; however, the Defendants state that it is the Jail's policy to not provide another physical exam in this instance. [Doc. 40 at 92.]
   Sheriff Policy 251 provides, "The physician will report to the facility a minimum of four (4) days a week . . . ." [Doc. 54-6 at 42.]
   Much of the above is also required under Ohio law. *See* OAC 5120:1-8-09.

[13/] Sheriff Policy 245 provides, "All officers will receive training in conducting medical screening. It is the responsibility of all officers to complete the medical screening form." [Doc. 54-6 at 23.] While Dr. Baster says that the intake officers administering these screenings are not "health trained professionals" [Doc. 62, at 20.], the Plaintiff provides no evidence as to whether the intake officers meet the lower training standard for "health trained personnel" as defined in OAC 5120:1-7-02(B)(19). *See* footnote 11.

Case No. 1:07-cv-00947
Gwin, J.

it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Sixth Circuit has instructed that "if the federal claims are dismissed before trial, . . . the state claims generally should be dismissed as well." *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 233 (6th Cir. 1997) (*quoting Taylor v. First of Am. Bank-Wayne,* 973 F.2d 1284, 1287 (6th Cir. 1992). Thus, under § 1367(c)(3), the Court declines to exercise supplemental jurisdiction and dismisses the Plaintiff's state claims without prejudice.

### IV. Conclusion

In conclusion, the Court **GRANTS** the Defendants' motion for summary judgment, thereby dismissing the Plaintiff's federal claim with prejudice and his state law claims without prejudice.

IT IS SO ORDERED.


Dated: March 3, 2008                    s/            *James S. Gwin*
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE